JON M. SANDS
Federal Public Defender
District of Arizona
850 West Adams, Suite 201
Phoenix, Arizona 85007
Telephone: (602) 382-2700

JANE L. McCLELLAN
State Bar No. 015902
Asst. Federal Public Defender
jane_mcclellan_@fd.org
Attorney for Defendant

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>    Plaintiff,<br><br>    vs.<br><br>Gordon L. Hall,<br><br>    Defendant. | 13-7087-M<br><br>DEFENDANT'S RESPONSE TO GOVERNMENT'S MOTION TO COMPEL TUBERCULOSIS TESTING |

Defendant Gordon L. Hall, through undersigned counsel, hereby submits this response to the Government's Motion to Compel Tuberculosis Testing. This Court has granted the Government's motion and ordered the U.S. Marshal to administer tuberculosis testing. Therefore, this issue may be moot. Nevertheless, Defendant submits this Response in support of his right to refuse such testing.

## I.   LAW AND ARGUMENT

The U.S. Constitution, Amend. XIV, § 1, states:

> No state shall make or enforce any law which shall abridge the privileges and immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of laws.
>
> Inmate status does not forfeit the protections an inmate has under the Constitution.

*Bell v. Wolfish*, 441 U.S. 520, 545 (1979).

> An individual's mere presence in a prison cell does not totally strip away every garment cloaking his [Constitutional] rights, even though the covering that remains is but a small remnant.

*United States v. Cohen*, 796 F.2d 20, 24 (2d Cir.); *see also Mauro v. Arpaio*, 147 F.3d 1137 (9th Cir. 1998).

"[C]onvicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell*, 441 U.S. at 545. *Bell* concluded that concern applied to convicted prisoners and pretrial detainees alike. *Id.* Although the government may, within limits, contravene these protections, any authority to do so must reflect the principle that "there is no iron curtain drawn between the Constitution and the prisons of this country." *Wolff v. McDonell*, 418 U.S. 539, 555-56 (1974).

The U.S. Constitution, Amend. XIV, guarantees a person the right of personal privacy. *Roe v. Wade*, 410 U.S. 113, 152 (1973). Specifically, the Due Process Clause "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). The guarantee of personal privacy covers these fundamental liberties, which include the right "to bodily integrity" and "the traditional right to refuse unwanted lifesaving medical treatment." *Roe*, 410 U.S. at 152; *Glucksberg*, 521 U.S. at 720.

Giving prison officials the right to forcibly inject a purified protein derivative ("PPD") into the skin of another person violates an esteemed venerable common-law principle. "At common law, even the touching of one person by another without consent and without legal justification was a battery." *Cruzan v. Dir., Mo. Dep't. of Health*, 497 U.S. 261, 269 (1990).

> No right is held more sacred, or is more carefully guarded, by
> the common law, than the right of every individual to the
> possession and control of his own person.

*Id.* (*quoting Union Pacific R.R. Co. v. Botsford*, 141 U.S. 250, 251 (1891)). Courts have long recognized that the right to bodily integrity necessitates a patient's informed consent to medical procedures. *Schloendorff v. Society of New York Hospital*, 105 N.E. 92, 93 (1914). "Every human being of adult years and sound

3

mind has a right to determine what shall be done with his own body." *Id*. Medical self-determination is a fundamental legal concept.

> Anglo-American law starts with the premise of thorough-going self-determination. It follows that each man is considered to be master of his own body … .

*Natanson v. Kline*, 350 P.2d 1093, 1104 (Kan. 1960) (a doctor may not substitute his own judgment for that of the patient to override lack of consent). The common law principle of self-determination is now a well-recognized constitutional right. *Planned Parenthood v. Casey*, 505 U.S. 833, 849 (1992). "It is settled now … that the Constitution places limits on a State's right to interfere with a person's most basic decisions about … bodily integrity." *Id*. A person's right to self-determination usually, "outweighs any countervailing state interests, and competent persons generally are permitted to refuse medical treatment, even at the risk of death." *Id*. (*quoting In re Conroy*, 486 A.2d 1209, 1225 (N.J. 1985)).

> On balance, the right to self-determination ordinarily outweighs any countervailing state interests, and competent persons generally are permitted to refuse medical treatment, even at the risk of death. Most of the cases that have held otherwise, unless they involved the interest in protecting innocent third parties, have concerned the patient's competency to make a rational and considered choice.

*Id*.

In deciding whether to forcibly subject an inmate to tuberculosis skin test injections, the court can look to the same considerations in reviewing prison

regulations – whether the act is reasonably related to a legitimate penological interest, enough to over-ride the inmate's constitutional protections. *Turner v. Safley*, 482 U.S. 78, 87, 89 (1987).

*Turner* sets forth a test to evaluate balancing the government's desire against the inmate's. First, the must be a "valid, rational connection" between the requested action and the legitimate governmental interest put forward to justify it." *Id*. at 89-90. The governmental objection must be a legitimate and neutral one. *Id*. Second, the court decides whether there exists an alternative means of exercising the right that remains open to prison inmates. *Id*. The absence of ready alternatives is evidence of the reasonableness of a prison regulation. *Id*. Finally, the court must consider what impact accommodation of the asserted constitutional right will have on guards and other inmates and on the allocation of prison resources generally. *Id*.

Although the law is well-settled that there is a legitimate penological interest in preventing the spread of tuberculosis, the courts have upheld inmate challenges to forced tuberculosis skin injections. *Karolis v. New Jersey Dep't of Corrections*, 935 F.Supp. 523 (D. N.J. 1996) (inmate permitted to refuse skin injection test on First Amendment grounds); *see also Jihad v. Wright*, 929 F.Supp. 325, 331 (N.D. Ind. 1996) (summary judgment in favor of prison denied when evidence showed inmate was willing to submit to x-rays). In view of the other, less invasive

measures available to screen for the disease, inmates may elect to submit to a chest x-ray and/or a sputum sample (considered the "gold standard" for detecting tuberculosis). *Reynolds v. Goord*, 103 F.Supp. 316, 322 (S.D. N.Y. 2000); *see also Selah v. Goord*, 255 F.Supp. 2d 42, 47 (N.D. N.Y. 2003).

The court has found several problems with PPD testing. First, "[t]here is some concern over the accuracy of the test. False positives are possible with the PPD test. About fifteen percent of tests will be false positives due to related diseases." *Selah*, 255 F.Supp. 2d at 46-47. Moreover, "[i]n a person without active tuberculosis or HIV, about 2-5 percent of the tests will be false negatives." *Id*. at 46; *compare Reynolds*, 100 F.Supp. at 321 (error rates as high as 10-25% in those with active TB and up to 30% in those with HIV). The test can also produce false negatives in an individual with active tuberculosis or a disease that compromises the immune system. *Selah*, 225 F.Supp. 2d at 46. Additionally, a person who has tested positive in the past will continue to test positive whether the disease is active or not. *Id*. at 47. Finally, "[t]he greatest problem with the test is that it is subject to human error when the test is read." *Id*. at 46.

In view of the problems with PPD testing and the availability of less invasive measures to test for tuberculosis, it is unreasonable to subject Mr. Hall to forced PPD skin injections. Accommodating Mr. Hall's desire to not submit to forced skin injections will not adversely impact guards or other inmates. As Mr.

Hall has already experienced, asserting a right to not be subjected to forced skin injections results in a medical quarantine. Medical quarantine is punitive in the sense that Mr. Hall's movement is more restricted than an inmate in general population.

## II. CONCLUSION

Although the issue may now be moot, this Court should not force an inmate to endure forced skin injections in view of the availability of other less invasive and more accurate tests.

Respectfully submitted this 20th day of March, 2013.

JON M. SANDS
Federal Public Defender

 *s/ Jane L. McClellan*
JANE L. McCLELLAN
Asst. Federal Public Defender

| | |
|---|---|
| 1 | Copy of the foregoing transmitted by ECF for filing this 20th day of March, 2013, to: |
| 2 | |
| 3 | |
| 4 | Clerk's Office<br>United States District Court |
| 5 | Sandra Day O'Connor Courthouse |
| 6 | 401 W. Washington<br>Phoenix, Arizona 85003 |
| 7 | |
| 8 | Lisa Settel |
| 9 | Assistant U.S. Attorney<br>United States Attorney's Office |
| 10 | Two Renaissance Square |
| 11 | 40 N. Central Avenue, Suite 1200<br>Phoenix, Arizona 85004-4408 |
| 12 | |
| 13 | Copy mailed to: |
| 14 | Gordon L. Hall |
| 15 | Defendant |
| 16 | |
| 17 | _s/ J. McClellan / mg_ |
| 18 | J. McClellan / mg |